# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## SOUTHERN DIVISION -- LONDON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>V.<br><br>TERRY SMITH,<br><br>    Defendant. | CRIMINAL ACTION NO. 6:13-34-KKC<br><br><br>__OPINION AND ORDER__ |

After a week-long trial, the jury found Defendants Terry Smith and Gerry Smith guilty of conspiring to distribute oxycodone. The jury also found Terry guilty of distributing oxycodone resulting in the death of another and being a felon in possession of a firearm. All of these charges stem from "sponsoring" individuals to obtain prescriptions for oxycodone from pain clinics, confiscating a share or all of the "sponsored" prescription medication, and then distributing the prescription medication.

At the close of the government's evidence and again after the close of all evidence, the defense sought a judgment of acquittal on all counts of the indictment. The Court denied the motions on all counts. This matter is now before the court on Defendant Terry Smith's post-verdict motion for judgment of acquittal (DE 211), Terry's *pro se* motion for new trial (DE 213), and Terry's unsigned *pro se* motion to "dismiss and/or suppress" (DE 214). For the following reasons, the Court will deny Terry's motions.

## I.

In 2011 various federal, state, and local agencies (the "Task Force") began investigating the burgeoning abuse of prescription drugs in Eastern Kentucky. The Task Force identified one method used to bring excess prescription drugs to Eastern Kentucky— "diversion." Law enforcement officials use the term diversion in reference to plans or

schemes to divert legal narcotic pain medication from its legal distribution and use for the purpose of illegal procurement, distribution, or use. Here, the government presented evidence that individuals traveled to corrupt, out-of-state pain clinics and fraudulently procured prescriptions[1] for oxycodone that they later filled at profiteering pharmacies.

Corrupt pain clinics accepted only cash payments, and "patients" received minimal or no physical examination from a doctor before receiving a prescription for narcotic pain medication. Most individuals who traveled to these out-of-state pain clinics lacked medically-justifiable reasons to receive prescriptions for narcotic pain medication and could not afford travel or medical costs—"sponsors" organized and financed the scheme.

These individuals, who were neither injured nor sick, traveled from Kentucky to pain clinics in Florida and Georgia for the express purpose of obtaining fraudulent prescriptions for narcotic pain medication. At the time, Florida and Georgia lacked centralized reporting requirements regarding prescription narcotic pain medications. Without state-wide reporting requirements providing information to a national database, these individuals could visit multiple pain clinics and receive numerous prescriptions for narcotic pain medication significantly in excess of a therapeutic dosage.

Once these individuals received a prescription from a corrupt, out-of-state pain clinic, they filled the prescriptions at a profiteering pharmacy. Profiteering pharmacies were licensed pharmacies that could fill any prescription but also filled all prescriptions for powerful controlled substances, such as oxycodone, in exchange for cash payments in excess of the retail price for the medication. These individuals then illegally distributed their prescription narcotic medication to others for recreational use.

---

[1] A "fraudulent prescription" is a prescription written without medical support demonstrating the recipient's need for the prescription.

2

At trial, the Task Force officers testified that they learned about Terry Smith while investigating several large-scale organizations engaged in diverting narcotic pain medication. They learned that Terry Smith—a trailer park landlord in Manchester, Kentucky with a second residence in Berea, Kentucky—entrusted drivers with money to transport and pay the expenses for two to four people ("sponsorees") to travel to an out-of-state pain clinic, obtain prescriptions for oxycodone, and fill the prescriptions at a profiteering pharmacy. Upon returning to Eastern Kentucky, the driver would bring the sponsorees and the filled prescriptions to Terry's house to "settle up."

Terry's sponsorees were typically drug addicts or tenants of Terry's trailer park who had fallen behind on their rent. Terry calculated the amount of money he had advanced to finance each sponsoree's trip and withheld an amount of pills that he deemed financially equivalent to his advance. Then, he would split the remainder of pills with the sponsoree who either used or resold them. Sometimes, Terry offered the non-addict tenants cash or reduced rent in exchange for the entire prescription.

Some of Terry's sponsorees also procured pills on behalf of other local sponsors. For example, Bill Stanley testified that both Terry Smith and Sue Fox paid him and his girlfriend, Patty Smallwood, to visit out-of-state pain clinics for the sole purpose of getting prescriptions for oxycodone. Bill also testified that Terry had driven Bill and Patty to a pain clinic in September 2011. Terry paid all the expenses, including the doctor's visit and the pharmacy bill. Terry then provided Bill and Patty with a portion of the pills as payment for their services. Bill testified that after one trip, he and Patty returned home and began using the pills they got from Terry. At some point, Patty told Bill she had a headache and went to bed. Bill continued his drug use until he fell asleep in the couch. The next morning Bill woke up and found Patty dead in her bed. Shocked, Bill called 911. The Clay County

3

Deputy Coroner arrived, pronounced Patty dead, noted that there was no evidence of trauma, and took a blood sample for a postmortem toxicology screen. The postmortem toxicology report found that Patty had more than four times the maximum therapeutic level of oxycodone in her system—a lethal dosage.

In addition to financing others, Terry and his wife, Gerry Smith, traveled to out-of-state pain clinics to obtain their own prescriptions for oxycodone for no medical purpose. In July 2011, Gerry began visiting Georgia Health Associates ("GHA")—a pain clinic in Tucker, Georgia run by Dr. Michael Johnston. Gerry visited GHA once a month until November 2011. Gerry visited GHA once a month only because pain clinics operated on a 28-day cycle to try to evade detection by federal and state authorities. GHA did not succeed. In November 2011, the Drug Enforcement Administration ("DEA") raided GHA and shut down the pain clinic.

In December 2011, Gerry went to North Georgia Total Health ("NGTH"), which tested Gerry's urine for the presence of oxycodone. Her urinalysis was negative for oxycodone despite her having received continuous prescriptions for oxycodone from GHA. Nonetheless, Gerry received another prescription for oxycodone. After a second negative urinalysis in January 2012, NGTH counseled Gerry that she would not receive oxycodone prescriptions because a negative urinalysis result for oxycodone indicated that she was not taking the medication.

Angela Smith, Gerry's sister in law, described how sponsorees that did not take the prescribed medication could "pass" a urinalysis. Sponsors gave non-user sponsorees a "sugar pack" that contained portions of crushed up medication, and—prior to submitting a urine sample—the non-user sponsoree would pour the contents of the sugar pack into the

4

sample. Gerry urinalysis never returned negative for the presence of oxycodone after January 2012.

In April 2012, Terry started visiting NGTH. Terry and Gerry continued receiving prescriptions for oxycodone from NGTH through 2012. In all, Terry and Gerry received prescriptions for more than 5,000 oxycodone pills.

Throughout 2012 and into 2013, the Task Force acted on the fruits of their investigations. The Task Force executed numerous search warrants but noted that they recovered less evidence from each subsequent search as individuals destroyed and removed evidence. The Task Force also began arresting participants, including Larry Smith—Terry's brother—and Charles Tenhet—the owner and operator of Community Drug, a local profiteering pharmacy.

In August 2013, the Task Force executed searches on Terry and Gerry's residences in Manchester and Berea. The Task Force found Terry's and Gerry's medical records from their visits to the Georgia pain clinics, but—conspicuously—the Task Force did not find one oxycodone prescription bottle or pill. In the Berea residence, the Task Force found six handguns, three rifles, one shotgun, and a substantial amount of ammunition.

A grand jury returned a three-count indictment against Terry and a one-count indictment against Gerry. Count 1 charged Terry and Gerry with conspiring to knowingly and intentionally distribute oxycodone in violation of 21 U.S.C. § 846. Count 2 charged Terry with distributing oxycodone resulting in the death of Patty Smallwood in violation of 21 U.S.C. § 841(a)(1). Count 3 charged Terry with being a felon in possession of firearms in violation of 18 U.S.C. § 922(g)(1). (DE 163.)

A jury trial occurred in London, Kentucky in January 2015. At the close of the government's proof, both Terry and Gerry moved for a judgment of acquittal pursuant to

Rule 29(a) of the Federal Rules of Criminal Procedure. The Court denied the motion. Terry and Gerry renewed the motion at the close of their case, but the motion was again denied. On January 26, 2015, a jury found Terry and Gerry guilty on all counts and answered a special interrogatory finding that Patty's death would not have occurred but for her use of oxycodone distributed by Terry. (DE 208.)

## II.

A motion for a judgment of acquittal and a motion for new trial are governed by very different standards. Federal Rule of Criminal Procedure 29(c) addresses motions for a judgment of acquittal after a jury verdict has been returned and such motions may be granted only if the evidence is insufficient to sustain the conviction. "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). The evidence presented at trial does not need to remove every other reasonable hypothesis other than guilt, and circumstantial evidence alone can sustain a jury's verdict. *United States v. Hughes*, 505 F.3d 578, 592 (6th Cir. 2007). Overall, a criminal defendant bears a very heavy burden. *United States v. Graham*, 622 F.3d 445, 448 (6th Cir. 2010).

Conversely, a motion for a new trial applies a broader standard. Rule 33 of the Federal Rules of Criminal Procedure provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." The Rule does not provide more specific grounds, but several recurring themes emerge from the body of Rule 33 case law. *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010).

It has long been recognized that Rule 33 authorizes a new trial if the jury verdict is against the weight of the evidence. *Tibbs v. Florida*, 457 U.S. 31, 38 n.12 (1982); *Munoz*,

605 F.3d at 373. The court, however, should grant a motion for a new trial based upon this ground "only in the extraordinary circumstance where the evidence preponderates heavily against the verdict." *Hughes*, 505 F.3d at 592–93 (internal quotations omitted). "When considering a motion for new trial based upon the weight of the evidence, district judges can act in the role of a 'thirteenth juror' and consider the credibility of the witnesses and the weight of the evidence to insure that there is not a miscarriage of justice." *United States v. Lutz*, 154 F.3d 581, 589 (6th Cir. 1998).

Additionally, the "interest of justice" standard allows the grant of a new trial where substantial legal error occurred. *Munoz*, 605 F.3d at 373. It is clear that violations of a defendant's Constitutional Rights and errors of sufficient magnitude to require reversal on appeal are grounds to grant a new trial, but it is less clear whether other alleged errors satisfy the "interest of justice" standard. *Id.* at 373–74.

Terry's motion for a judgment of acquittal pointedly argues that the government did not present sufficient evidence to sustain a guilty verdict against Terry for Counts 1, 2, and 3 of the third superseding indictment. (DE 211 at 2–6.) Terry's *pro se* motion for a new trial includes six arguments. (DE 213-1 at 7–15.) Terry's third argument in support of the motion for a new trial, while not directly moving this Court to order a new trial on manifest-weight-of-the-evidence grounds, asserts that the jury's resolution of conflicting testimony was in error. To avoid any possible prejudice to Terry and aware that Terry's Rule 33 motion was filed *pro se*, the Court will interpret Terry's third argument as an assertion that the jury verdict was against the manifest weight of the evidence. *See Tibbs*, 457 U.S. at 42. Terry's first, second, fourth, and fifth arguments assert Constitutional errors and errors of a sufficient magnitude to require reversal on appeal. Finally, Terry's sixth argument asserts generalized error.

7

* * * * *

To address all of Terry's arguments and to avoid all possible prejudice, the Court will first evaluate the evidence presented at trial under the broader Rule 33 standard, then the Court will evaluate the evidence presented at trial under the more deferential Rule 29 standard with respect to each count charged against Terry, and finally the Court will evaluate Terry's asserted legal errors.

## A. Evaluating the Weight of the Evidence Under the Broader Rule 33 Standard

Terry asserts that there is insufficient evidence to support his conviction under Rule 29(c) and that his conviction is against the weight of the evidence under Rule 33. Because the Rule 33 standard is more favorable to Terry, the Court first addresses Terry's arguments pursuant to that rule.

Terry's argument that the jury verdict is against the manifest weight of the evidence relies upon three alleged errors by the jury. First, Terry asserts that the jury improperly resolved conflicting lay witness testimony concerning the existence of the conspiracy and Terry's distribution of oxycodone to Patty Smallwood. Second, Terry claims that the jury improperly weighed medical expert testimony to find that use of oxycodone distributed by Terry was a but-for cause of Patty Smallwood's death. And third, Terry contends that the jury verdict is against the manifest weight of the evidence because the government only introduced circumstantial evidence. (DE 213-1 at 9, 11.)

### *1. Lay witness testimony establishes that Terry conspired to distribute oxycodone and that Terry distributed the oxycodone that Patty Smallwood consumed immediately preceding her death.*

The United States called a number of lay witnesses that described Terry's conspiracy to distribute oxycodone and to establish that Terry had distributed the oxycodone that Patty Smallwood consumed immediately preceding her death.

8

a) <u>Lay witnesses testifying for the United States</u>

Bill Stanley testified that both Terry and Sue Fox sponsored trips for him to visit out-of-state pain clinics to obtain prescriptions for oxycodone. He explained that the driver would pay all of the expenses for the trip and that, on one occasion, Terry had acted as the driver. Terry paid for the doctors' visits and filled the prescriptions. Terry then took "his cut." Initially, Bill denied selling oxycodone pills for Terry, but Bill later recanted and admitted that he had sold pills for Terry and explained that he had denied selling oxycodone pills for Terry because he was "scared of retaliation" from Terry.

Bill Stanley also described a particular trip to GHA in Tucker, Georgia. Bill testified that in September 2011, a few days before Patty's death, Terry sponsored Bill's and Patty's visits to GHA. When Bill and Patty returned from Georgia, they brought their filled prescription bottles of oxycodone to Terry to "settle up." After receiving their share from Terry, Bill and Patty returned home and immediately began using the oxycodone that she and Bill received from Terry. Patty then told Bill that she had a headache and left to take a shower and lie down in her bedroom. Shortly thereafter, Bill fell asleep on the living-room couch watching television. Bill woke up the next morning and found Patty dead.

Jimmy Harris testified that he drove Terry's sponsorees to pain clinics in Florida and Georgia at least fifteen times. Jimmy stated that Terry would give him the money to pay for a trip if Terry didn't trust the sponsoree. Jimmy explained that after trips to doctors in Florida, he filled the prescriptions at pharmacies in Florida and after trips to doctors in Georgia, he filled the prescriptions with Charles Tenhet at Community Drug. Jimmy also stated that he only drove one to three sponsorees at a time to avoid suspicion. Jimmy testified that Terry paid him $100 for each trip and that he only took oxycodone pills "every now and then."

Gary Nantz, Rose Centers, and Betty Tipton were tenants in Terry's trailer park which was across the street from his house. All three witnesses admitted to using oxycodone, and all three described Terry's sponsorship of their visits to out-of-state pain clinics along with the compensation they received from Terry. All three described receiving a discount on their rent, a quantity of oxycodone pills, or a combination of discounted rent and quantity of pills in exchange for traveling to the out-of-state pain clinics.

Chris Gregory was Terry's trailer park tenant but did not use oxycodone. Chris testified that, when he was unemployed and looking for work, Terry approached him and asked him to drive sponsorees to out-of-state pain clinics and, later, to visit pain clinics himself to receive prescriptions for oxycodone. Chris stated that he got "food money and $100" for each trip. Additionally, Chris testified that—on one occasion—he sold oxycodone pills for Terry. Chris described the process as follows: He received about ten pills from Gerry, sold each pill for $50, gave the proceeds to Gerry, and then received ten more pills. Chris claimed that the margin he received for each pill sold was "not worth" the risk. Accordingly, he stopped selling pills for Terry.

Brandon Stanley worked for and rented from Terry for approximately five years. Brandon claimed that Terry trusted him because he and Terry had a long-term working relationship. Brandon stated that—because Terry trusted him—he spent a significant amount of time in Terry's house and witnessed sponsorees bringing prescription medication into Terry's house after returning from pain clinics.

In particular, Brandon testified that he was present when Patty Smallwood returned from GHA in September 2011 and witnessed Terry "split the medicine up" and give Patty her "cut" on the date of her death. Brandon also stated that he saw Terry distribute oxycodone pills to trusted confidants—such as Joe Zorn, Tommy Johnson, and

10

Patty Smallwood—who sold the pills on Terry's behalf. And Brandon admitted that he was another trusted confidant. He said that he sold Terry's supply of oxycodone pills for eight months and that he charged $50 for each thirty milligram oxycodone pill and $25 for each fifteen milligram oxycodone pill. He estimated that, over the eight-month period, he sold 5,000 pills for Terry.

Terry also recruited Brandon to travel to out-of-state pain clinics. Brandon stated that he made two trips for Terry and that Terry offered to split the pills or to take $400 off Brandon's rent to compensate him for his time and effort. Additionally, Brandon testified that he occasionally saw Terry with a handgun, and he thought it was a nine millimeter Browning.

Jennifer Mathis worked at Community Drug from 2003 until 2012. She described how, beginning in 2010, Community Drug filled any and all out-of-state prescriptions for controlled substances in exchange for cash payments in excess of the retail price for the medication. Jennifer then explained Community Drug's recording system. She also testified that sponsors, such as Sue Fox, would occasionally accompany individuals to the pharmacy, but that, generally, the pharmacy was operating "wide open."

On cross examination, Terry's counsel verified that Jennifer had seen Sue Fox accompany Bill Stanley to Community Drug. Terry's counsel attempted to intimate, and Terry now asserts, that Jennifer testified that Sue accompanied Bill in September 2011 immediately prior to Patty Smallwood's death; however, Jennifer merely described general trends. Jennifer stated that Sue *had* accompanied Bill but that Bill also filled prescriptions at Community Drug without Sue.

b)  Lay witnesses testifying for Terry

Terry called two lay witnesses, Billy Wombles and Beulah Kemp. Terry hired Billy as a watchman for his rental properties, and Billy declared that he never observed any drug use or drug dealing at Terry's rental properties. Billy was also Patty Smallwood's nephew and he claimed to be very close to her. On cross examination, however, Billy testified that he was not aware that Patty—one of Terry's tenants and his "close" relative—frequently traveled to out-of-state pain clinics to receive oxycodone. And Billy, despite working as a "watchman," was only able to name a few of Terry's tenants.

Beulah Kemp cleaned Terry and Gerry's Manchester residence. Beulah testified that she came to their house twice a week and cleaned for eight hours. Beulah stated that she never observed any illegal activity occurring in or around Terry and Gerry's residence.

c)  Comparing lay witness testimony

Evaluating all the evidence presented at trial and assessing the credibility of the government's witnesses—some of whom the Court acknowledges had a history of drug use—in the role of the "thirteenth juror," the Court does not find that the evidence preponderates heavily against the jury's verdict on any count. *See Hughes*, 505 F.3d at 592–93.

There are discrepancies among the witnesses' testimonies, but the Court finds the discrepancies immaterial. Billy Wombles asserted not to have seen any drug activity around Terry's rental properties, but Billy's testimony was not credible. His testimony was vague, inconsistent, and implausible. Beulah Kemp also testified that she did not observe any criminal activity in and around Terry's residence; however, Beulah was only occasionally present and maintained a regular schedule. It would not have been difficult for Terry to hide evidence from Beulah. Finally, Jennifer Mathis's testimony does not

12

contradict the testimony of any government witness. Jennifer's testimony included the following exchange:

> (Cross Examination)
>
> MR. EDWARDS:[2] [Y]ou were familiar that Sue Fox brought in random people to Community Drug to get their controlled substance prescriptions filled?
>
> MS. MATHIS:    Yes.
>
> MR. EDWARDS: And in particular, do you recall making a statement that you recall Miss Fox bringing in Bill Stanley?
>
> MS. MATHIS:    Yes.
>
> MR. EDWARDS: And that Mr. Stanley would get prescriptions for himself and for a female subject?
>
> MS. MATHIS:    Yes.
>
> . . .
>
> MR. EDWARDS: Okay. And again, you recall making the statement and seeing Mr. Stanley come in to Community Drug with this individual, Sue Fox?
>
> MS. MATHIS:    Yes.
>
> . . .
>
> (Redirect Examination)
>
> MR. DOTSON:    Ma'am, with regard to Sue Fox and Bill Stanley, is it fair to say that Bill Stanley is kind of a hard guy to forget?
>
> MS. MATHIS:    Yes.
>
> MR. DOTSON:    And Sue Fox wasn't the only person that was—or sponsor, I'll use the term Mr. Edwards used, the only sponsor bringing people there to get their prescriptions filled, was she?
>
> MS. MATHIS:    I don't think so.
>
> MR. DOTSON:    . . . [W]ould it be fair to say that Community Drug was running pretty wide open at this time?
>
> MS. MATHIS:    Yes.
>
> MR. DOTSON:    And that they were filling out-of-state prescriptions for almost everyone that came in?
>
> MS. MATHIS:    Yes.
>
> . . .

_____

[2] Mr. Edwards was Terry's trial counsel, and Mr. Dotson was the Assistant United States Attorney representing the United States at trial.

> MR. DOTSON:     . . . [I]s there any indication that Sue Fox was the person sponsoring all of these people?
>
> MS. MATHIS:     No.

(DE 236 at 10–11, 13–14.) Jennifer Mathis clearly establishes that Sue Fox sponsored Bill Stanley, but Jennifer never states that Sue Fox was Bill Stanley's *only* sponsor or that Sue accompanied Bill in September 2011. Jennifer thought that Bill had numerous sponsors. Therefore, Jennifer's testimony is not contradictory.

### d)  Elements for conspiracy to distribute oxycodone

To sustain a conviction for conspiracy to distribute oxycodone, the government must prove that the defendant entered into an agreement to violate drug laws, had knowledge of and intent to join the conspiracy, and participated in the conspiracy. *United States v. Gardner*, 488 F.3d 700, 710 (6th Cir. 2007). The evidence at trial established that Terry orchestrated a complex scheme to distribute oxycodone in Eastern Kentucky. Terry recruited tenants and drug addicts to take trips to out-of-state pain clinics; entrusted drivers with money to complete the trips and fill the prescriptions; and utilized a few close associates to sell the oxycodone pills.

Evidence presented by the defense or elicited through cross-examination did not negate the proof of this conspiracy. As previously noted in this opinion, the Court finds that Billy Wombles's testimony was not credible. Billy stated that he was a watchman with a close relationship to his aunt, Patty Smallwood; however, Billy could not name many of the tenants, did not know that Terry and Gerry frequently took out-of-state trips, did not know that his aunt frequently took out-of-state trips, and did not know that his aunt had an addiction to oxycodone. Beulah Kemp's testimony was reliable but immaterial. Beulah stated that she was present at Terry and Gerry's residence infrequently and on a regular schedule. Therefore, her lack of knowledge of illegal activity in and around Terry and

14

Gerry's residence is unsurprising. Finally, Jennifer Mathis's testimony does not contain what Terry wishes. Jennifer never stated that Sue Fox was Bill Stanley's *only* sponsor. Rather, Jennifer acknowledges that, at the time, Community Drug was "running wide open" and that they were continuously filling out-of-state prescriptions. Jennifer's testimony does not negate the evidence that Terry sponsored Bill and Patty.

Overall, the lay witness testimony—together with the expert testimony and documentary evidence—establishes beyond a reasonable doubt that Terry conspired to distribute oxycodone. As the leader of this conspiracy, the United States established beyond a reasonable doubt that Terry entered into multiple agreements, had knowledge of and an intent to violate the drug laws, and participated in the conspiracy. *Gardner*, 488 F.3d at 710.

### e)   Elements for distribution of oxycodone resulting in the death of another

To sustain a conviction for distribution of oxycodone resulting in the death of another, the government must prove beyond a reasonable doubt that the defendant distributed the oxycodone to the deceased and that the distributed oxycodone was a "but-for cause of death." *Burrage v. United States*, 134 S. Ct. 881, 886–87, 892 (2014). Terry's motion for new trial challenges the lay witness testimony establishing Terry's distribution of oxycodone to Patty Smallwood. (DE 213-1 at 12.) In particular, Terry asserts that Jennifer Mathis's testimony proves that Sue Fox sponsored Bill and Patty and, therefore, Terry did not distribute any oxycodone to Patty.

Acting in its role as the "thirteenth juror," the Court does not find that Jennifer Mathis's testimony established that Sue Fox distributed the oxycodone that Patty Smallwood consumed immediately preceding her death. Jennifer asserted that Sue was *a* sponsor for Bill, not *the* sponsor for Bill. Further, Jennifer never stated that Sue

15

accompanied Bill or Patty to Community Drug in September 2011. Alternatively, both Bill Stanley and Brandon Stanley testified unequivocally that Terry distributed oxycodone pills to Patty the day before her death. Bill verified that Patty consumed the oxycodone that she received from Terry. Therefore, the lay witness testimony establishes that Terry knowingly distributed oxycodone to Patty and that Terry knew that the substance was oxycodone. *See Burrage*, 134 S. Ct. at 886–87.

### 2. Medical expert testimony establishes that the oxycodone Patty Smallwood consumed was a but-for cause of her death.

The United States called the deputy coroner and a toxicologist as an expert witness to establish that the oxycodone Patty Smallwood consumed was a but-for cause of her death. Terry called a medical examiner as an expert witness to attempt to refute the government's evidence.

### a) Medical testimony for the United States

Jared Becknell, the Clay County Deputy Coroner, was the first medical professional on the scene at Patty Smallwood's home on September 10, 2011. Jared found Patty lying in her bed, pronounced her dead, and took a blood sample. Jared noted that Patty's body did not show any signs of physical trauma and helped complete her certificate of death. The certificate of death listed Patty's cause of death as a combined drug intoxication from self-ingestion of alprazolam, oxycodone, THC, and hydrocodone. Jared declared that, according to the toxicology report, Patty had a very high amount of oxycodone and low or normal amounts of the other drugs. Specifically, the therapeutic range of oxycodone is 10 to 100 nanograms per milliliter, and Patty's toxicology report found that she had 467 nanograms per milliliter.

16

Michael Ward, a toxicologist, testified as an expert witness for the United States. He asserted that the level of oxycodone in Patty Smallwood's system was a large level consistent with being a "lethal or overdose level." He further testified that the levels of other drugs in Patty's system were not concerning. Additionally, Michael Ward described the process of postmortem drug redistribution. Postmortem drug redistribution is a scientific process by which drug residue may move between the liver and the heart after a person dies. Consequently, this phenomenon may cause a postmortem toxicology report to find artificially high or artificially low levels of drugs in someone's system. But Michael Ward testified that he did not think that postmortem drug redistribution substantially altered the findings in the toxicology report because the blood sample was collected shortly after Patty died. Further, Michael Ward asserted that a level above 200 nanograms per milliliter—less than half the amount found in Patty's system—would likely be a lethal level of oxycodone.

b)  <u>Medical testimony for Terry</u>

Dr. George Nichols, a medical examiner, testified as an expert witness on behalf of Terry Smith. Dr. Nichols did not examine Patty Smallwood, but he reviewed her medical records. Dr. Nichols testified that, despite all of the medical records and the coroner's postmortem examination, it was impossible to determine Patty's cause of death without an autopsy. Dr. Nichols acknowledged that an oxycodone level more than four times greater than the therapeutic range would "clearly" be in the toxic range; however, he questioned the validity of the toxicology report and asserted that postmortem drug redistribution could significantly alter every clinical finding. Finally, Dr. Nichols testified that he could not state with any medical certainty that any particular level of oxycodone would be lethal to Patty.

17

On cross-examination, Dr. Nichols acknowledged that his specific fields of interest included mass fatality management, hospital-associated disorders, medical device-related morbidity and mortality, child abuse, domestic violence, occupational disorders, clinical forensic medicine, medical negligence, and causation determination. Notably, Dr. Nichols did not previously identify toxicology as a specific field of interest. Further, Dr. Nichols admitted that none of Patty Smallwood's medical records indicated traumatic head injuries, cardiovascular problems, or any other condition that might have caused her death. Finally, Dr. Nichols confirmed that if postmortem drug redistribution caused an increase in Patty's oxycodone level, then the levels for all other drugs would have been elevated but that no other prescription drug level exceeded the therapeutic range.

c)  <u>Elements for distribution of oxycodone resulting in the death of another</u>

To sustain a conviction for distribution of oxycodone resulting in the death of another, the government must prove beyond a reasonable doubt that the distributed oxycodone was a "but-for cause of death." *Burrage*, 134 S. Ct. at 892. Terry's motion for new trial challenges the expert witness testimony establishing that Patty's use of the oxycodone distributed by Terry was a but-for cause of her death. (DE 213-1 at 12.) Specifically, Terry relies upon Dr. Nichols's testimony stating that the exact cause of death would be impossible to determine without an autopsy.

Acting in its role as the "thirteenth juror," the Court is unpersuaded by Dr. Nichols's testimony and concludes that Michael Ward's findings are credible. First, Dr. Nichols is not a toxicologist and he does not claim to have any special expertise in toxicology. Second, Dr. Nichols refused to acknowledge that the level of oxycodone in Patty's system could have had *any* effect, despite being more than four times higher than the upper bounds of the therapeutic level. Dr. Nichols took this extreme stance because he asserted that

18

postmortem drug redistribution rendered the toxicology report completely unreliable. He claimed that it would be impossible to know the true level of each drug in Patty's system; however, he acknowledged that postmortem drug redistribution has less of an effect if a sample is taken shortly after death, that a blood sample was taken from Patty within hours of her death, and that no other drugs were elevated to abnormal levels.

Conversely, Michael Ward—a toxicologist—acknowledged that postmortem drug redistribution may have affected the drug levels in the toxicology report but explained that any change would have been minimal because the blood sample was taken shortly after Patty died and no other drug levels appeared abnormal. Further, Michael Ward explained that an oxycodone level above 200 nanograms per milliliter—less than half of Patty's level of 467 nanograms per milliliter—would be lethal and that it is highly unlikely that postmortem drug redistribution could have caused such a substantial change in Patty's oxycodone level. Accordingly, the Court finds that the medical expert testimony establishes that the oxycodone distributed by Terry and used by Patty was a but-for cause of her death. *See Burrage*, 134 S. Ct. at 892.

### *3. Although the United States did not present any direct evidence of Terry's drug distribution or of Terry's possession of a firearm, the circumstantial evidence presented at trial preponderates heavily in favor of the guilty verdict.*

Terry asserts that he is entitled to a new trial because "State and Federal authorities never observed a single drug transaction and never recovered a single Oxycodone pill." (DE 213-1 at 11.) In essence, Terry objects to the jury returning a guilty verdict based upon circumstantial evidence. A verdict based solely on circumstantial evidence is not, however, grounds for a new trial pursuant to Rule 33. *See United States v. Perales*, 534 F. App'x 502, 504–05 (6th Cir. 2013).

19

Further, the Court notes that the circumstantial evidence presented at trial preponderates heavily *for* the guilty verdict, not against it. *See Hughes*, 505 F.3d at 592–93. Numerous witnesses described Terry's scheme; medical records from Georgia pain clinics, profiteering pharmacies, and Terry and Gerry's residence verified the scheme; lease agreements supported the rationale for certain members to join the scheme; a complete absence of *any* oxycodone pills upon execution of search warrants at Terry and Gerry's Manchester and Berea residences, despite ample documentation demonstrating Terry's and Gerry's alleged pain conditions "justifying" prescriptions for thousands of oxycodone pills, substantiate the conclusion that Terry and Gerry were selling, not using, their prescribed oxycodone; multiple witnesses testified that they saw Terry carrying firearms; and the presence of ten firearms at Terry's Berea residence supports the inference that Terry orchestrated a large-scale diversion scheme. Thus, after considering the weight of the evidence and credibility of the witnesses, the Court finds that the jury's verdict was not against the manifest weight of the evidence. *See Tibbs*, 457 U.S. at 38 n.12.

## B. Evaluating the Sufficiency of the Evidence Under the Deferential Rule 29 Standard

In addition to Terry's specific allegations that his convictions were against the weight of the evidence, Terry asserts that there is insufficient evidence to support his convictions. The Court will analyze Terry's Rule 29(c) challenge to all three convictions pursuant to the more deferential standard that examines the evidence in the light most favorable to the government and determines whether *any* rational jury could have found the essential elements of each count beyond a reasonable doubt. *Jackson*, 443 U.S. at 319.

### 1. Count 1: Conspiracy to Distribute Oxycodone

"The essential elements of conspiracy under 21 U.S.C. § 846 are (1) an agreement by two or more persons to violate the drug laws, and (2) knowledge of, intention to join, and participation in the conspiracy on the part of each conspirator." *United States v. Walker*, 160 F.3d 1078, 1084 (6th Cir. 1998). Terry insists that no reasonable jury could have convicted him of conspiracy to distribute oxycodone because the United States relied upon circumstantial evidence and the testimony of cooperating witnesses to establish the conspiracy to distribute oxycodone; however, his contentions are based upon a particular interpretation of the evidence, which the jury declined to adopt.

A conviction may be sustained by "circumstantial evidence alone," and "uncorroborated testimony of an accomplice may support a conviction in federal court." *Graham*, 622 F.3d at 448–49 (internal quotations omitted). Here, the circumstantial evidence demonstrated that Terry, Gerry, and Terry's sponsorees traveled to out-of-state pain clinics and obtained prescriptions of oxycodone. Numerous witnesses corroborated the general scheme of the conspiracy. The United States introduced medical records from GHA, NGTH, and a profiteering pharmacy, Community Drug, to demonstrate that Terry, Gerry, and Terry's sponsorees received prescriptions of oxycodone. The United States also introduced rental agreements between Terry and Terry's tenant-sponsorees that corroborated testimony that Terry would discount the tenant's rent in exchange for oxycodone. And Angela Smith, Terry's sister-in-law, explained important aspects of the conspiracy, including how non-users of oxycodone passed urinalyses.

Terry asserts that the Court should act as a "thirteenth juror" and reweigh the trial testimony because testimony from defense witnesses conflicts with testimony from sponsorees and Angela. Terry, however, conflates the Rule 29(c) and Rule 33 standards. "It

is the province of the [jury] to weigh the probative value of the evidence and resolve any conflicts in testimony." *Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003). In deciding a Rule 29(c) motion, it is inappropriate for the Court to invade the jury's province unless the United States failed to establish the elements of the crime beyond a reasonable doubt. *See Graham*, 622 F.3d at 448–49. The court acknowledges that the testimony of the government's and the defense's witnesses are inconsistent, but the Court will not upset the interpretation of the evidence adopted by the jury because the United States, through testimonial and documentary evidence, established sufficient proof for a rational jury to find Terry guilty of conspiracy to distribute oxycodone. *See United States v. Rogers*, 769 F.3d 372, 377 (6th Cir. 2014).

### *2. Count 2: Distribution of Oxycodone Resulting in Death*

Title 21 Section 841 of the United States Code prohibits the distribution of controlled substances. The Anti-Drug Abuse Act of 1986, 100 Stat. 3207, amended the penalties for violating § 841, including the "death results" enhancement. When "death or serious bodily injury results from the use of [the distributed] substance," the defendant "shall be sentenced to a term of imprisonment of not less than twenty years or more than life," a substantial fine, "or both." 21 U.S.C. § 841(b)(1)(C). If the "death results" enhancement increases the potential minimum and maximum sentences, "it is an element that must be submitted to the jury and found beyond a reasonable doubt." *Burrage*, 134 S. Ct. at 887. Thus, Count 2 of the Terry's third superseding indictment has two principal elements: (1) knowing or intentional distribution of oxycodone, § 841(a)(1), and (2) death resulting from the use of the distributed oxycodone, § 841(b)(1)(C). *Id.*

First, the element of knowing or intentional distribution of oxycodone requires that the government prove that "a defendant: (1) knowingly or intentionally distribute[d

oxycodone], and; (2) at the time of such distribution the defendant knew that the substance was [oxycodone]." *Graham*, 622 F.3d at 450 (internal quotations omitted).

Second, the element that death of another "results from" the use of the distributed oxycodone requires the government prove that the use of the distributed oxycodone is a "but-for cause of the death." *Burrage*, 134 S. Ct. at 892. But-for causation does not require the government to prove that use of the distributed oxycodone *alone* would have caused the death of another. *Id.* at 888. Rather, "if the predicate act combines with other factors to produce the result, [the predicate act is a but-for cause] so long as the other factors alone would not have done so—if, so to speak, it was the straw that broke the camel's back." *Id.*

Here, the United States—through testimonial and documentary evidence—demonstrated that Terry sponsored Patty Smallwood's visit to GHA immediately preceding her death, paid for Patty's prescription of oxycodone, and settled up with her by giving her a quantity of pills. Terry asserts that there is conflicting testimony concerning the distribution of the pills; however, the Court will not upset the interpretation of the evidence adopted by the jury. *See Rogers*, 769 F.3d at 377. The United States provided sufficient proof for a rational jury to find that Terry knowingly or intentionally distributed oxycodone to Patty.

The United States also demonstrated that Patty's death would not have occurred but for her use of the distributed oxycodone. The expert witnesses for the government and the defense agreed that Patty's toxicology report indicated that oxycodone was the only substance not within the therapeutic range. The government's expert witness even opined that, by itself, Patty's oxycodone level—more than four times the maximum therapeutic level—would be lethal.

23

Terry contends that the oxycodone could not be a but-for cause of Patty's death because her death certificate listed her cause of death as a combined drug overdose. Terry claims that each drug in her system should be characterized as a contributing factor and that no one drug was a but-for cause of Patty's death; however, a combination of factors (using multiple drugs) producing a result (death) does not preclude one factor (oxycodone use) from acting as a but-for cause if death would not have occurred *without* the one factor (oxycodone use). *Burrage*, 134 S. Ct. at 888. Plainly, oxycodone was a but-for cause of Patty's death if she would have lived had she *not taken* the oxycodone; if her consumption of oxycodone was the straw that broke the camel's back.

The jury heard testimony that the amount of oxycodone in Patty's system was more than just an additional straw and may have been lethal on its own. Therefore, the United States provided sufficient proof for a rational jury to find that Terry's distribution of oxycodone to Patty was a but-for cause of her death. *See id*.

### 3. Count 3: Felon in Possession of Firearms

The elements required to convict a defendant of being a felon in possession of a firearm, pursuant to 18 U.S.C. § 922(g), are: (1) the defendant had a previous felony conviction; (2) the defendant knowingly possessed a firearm; and (3) the firearm traveled in interstate commerce. *United States v. Nelson*, 725 F.3d 615, 619 (6th Cir. 2013). Terry stipulated to the first and third elements but asserts that the United States did not provide sufficient proof that he possessed the firearms specified in the third superseding indictment.

Possession may be established through actual or constructive possession, which may be proved through direct or circumstantial evidence. *United States v. Bailey*, 553 F.3d 940, 944 (6th Cir. 2009). Actual possession means that an individual has direct physical control

24

over an object. *Id.* "Constructive possession exists when a person does not have actual possession but instead knowingly has the power and the intention at a given time to exercise dominion and control over an object." *Id.* (emphasis and internal quotations omitted). "Proof that the person has dominion over the premises where the firearm is located is sufficient to establish constructive possession." *Id.* at 944–45 (internal quotations omitted).

Here, the guns listed in the indictment were found when the Task Force searched Terry's Berea residence. Terry asserts that the United States did not establish his possession of the guns because "at no time did law enforcement see or find Terry Smith in immediate possession of the firearm[s] . . . [or] locate[ ] the firearm[s] in an area or premises to which Terry Smith had dominion over." (DE 211 at 5–6.) The United States, however, introduced evidence of both actual and constructive possession.

Gary Nantz testified that he witnessed Terry with firearms and Brandon Stanley said that he saw Terry carrying a handgun on multiple occasions. Although Brandon thought that the handgun was a nine millimeter Browning, it is not unreasonable for the jury to have found that gun was actually one of the six handguns, including a nine millimeter Smith & Wesson, recovered from Terry's Berea residence.

Additionally, the United States introduced evidence of constructive possession. Special Agent Ian Dalrymple—an officer with the DEA who participated in executing the search warrant at Terry and Gerry's Berea residence—testified that he found numerous personal items in the residence that belonged to Terry and Gerry, including receipts and non-narcotic prescription bottles. Further, during cross examination, the defense presented Gerry's Kentucky Concealed Deadly Weapon Permit, but—conspicuously—Gerry obtained the permit only one month before the Task Force's search of the Berea residence.

Overall, the Court will not upset the interpretation of the evidence adopted by the jury because the United States, through testimonial and documentary evidence, established sufficient proof for a rational jury to find Terry guilty of being a felon in possession of firearms. *See Jackson*, 443 U.S. at 319; *Rogers*, 769 F.3d at 377.

## C. Alleged Legal Errors

The Rule 33 "interest of justice" standard allows the grant of a new trial where substantial legal error occurred. *Munoz*, 605 F.3d at 373. Substantial legal error includes violations of a defendant's Constitutional rights, but it is less clear if other alleged legal errors may warrant a new trial. *Id.* at 373–74. Here, Terry alleges five errors that, if true, would violate his Constitutional rights and a sixth generalized error. None of Terry's asserted errors, however, have merit.

### *1. Terry was not denied the right of a speedy trial.*

Terry notes that he was arrested on August 21, 2013 but his trial did not commence until January 20, 2015. He asserts that this delay violated his Sixth Amendment right to a speedy trial. (DE 213-1 at 7–8.)

"The Supreme Court has specified four factors for evaluating a Sixth Amendment speedy-trial claim: (1) length of delay, (2) the reason for the delay, (3) the defendant's assertions of his right, and (4) prejudice to the defendant." *United States v. Young*, 657 F.3d 408, 414 (6th Cir. 2011) (citing *Barker v. Wingo*, 407 U.S. 514, 530 (1972)). No one factor, however, is controlling. *Barker*, 407 U.S. at 533. "Rather, they are related factors and must be considered together with such other circumstances as may be relevant. In sum, these factors have no talismanic qualities; courts must engage in a difficult and sensitive balancing process." *Id.*

26

"The first *Barker* factor—the length of the delay—serves as a threshold or a 'triggering mechanism' for a speedy-trial analysis." *Young*, 657 F.3d at 414. "The length of delay is measured from the earlier of the date of indictment or arrest to the defendant's trial." *United States v. Bass*, 460 F.3d 830, 836 (6th Cir. 2006). A delay of more than one year is presumptively prejudicial and triggers application of the other three *Barker* factors. *Young*, 657 F.3d at 414. Terry was arrested in August 2013 and not tried until January 2015; therefore, Terry has suffered presumptively prejudicial delay.

The second *Barker* factor is the reason for the delay. 407 U.S. at 531. The purpose of this inquiry is to determine whether the government, the defendant, or outside forces, such as a missing witness, have primarily caused the delay. *See id.* It is improper for the government to delay the trial in order to hamper the defense, gain some tactical advantage over defendants, or harass defendants. *Id.* Further, "institutional problems" and delay resulting from a "systemic breakdown" may be charged to the government. *Vermont v. Brillon*, 556 U.S. 81, 92–94 (2009). But the defendant's deliberate attempt to disrupt proceedings must be weighed heavily against the defendant. *Id.* at 93–94.

Here, Terry or a co-defendant sought nearly every delay. Terry filed multiple motions to delay the trial (DE 19; DE 22; DE 50) and joined his co-defendants' motions (DE 43; DE 105). Additionally, the trial was delayed for nearly three months as one of Terry's co-defendants waited to receive a competency examination and hearing. (*See* DE 105; DE 112; DE 125.) Further, Terry sought additional time to employ a medical expert, for the medical expert to prepare a report, and for the medical expert to appear at trial. (*See* DE 125; DE 161.) Finally, Terry signed a speedy-trial waiver based upon his requests. (DE 164). The only delay *not* attributable to Terry occurred when the case was reassigned. (*See* DE 159; DE 160; DE 161.) The United States did not seek *any* additional time and

27

remained prepared to try the case; there was no attempt to gain a "tactical advantage" or "institutional problems." Accordingly, this factor weighs heavily against Terry.

The third *Barker* factor is the defendant's responsibility to assert his right. 407 U.S. at 531. "The defendant's assertion of his speedy trial right . . . is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right." *Id.* at 531–32. The Supreme Court noted, however, that the defendant's failure to assert the speedy trial right "will make it difficult for a defendant to prove that he was denied a speedy trial." *Id.* at 532.

Here, Terry first asserts a violation of his speedy-trial right in the present motion. Additionally, Terry repeatedly asked for and joined continuances (DE 19 (Terry's motion); DE 22 (same); DE 43 (joining Gerry's motion); DE 50 (Terry's motion); DE 105 (order granting motions from three co-defendants and joining Terry); DE 126 (minute entry noting that Terry needed time to finish procuring evidence and an expert report)), never filed a motion for an immediate trial, and signed a speedy-trial waiver on December 10, 2014 (DE 162). Therefore, this factor has little weight.

The fourth *Barker* factor is prejudice to the defendant. 407 U.S. at 532. The prejudice prong is designed to protect the following interests: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Id.* Generally, these interests seek to protect a fair trial that enables the defense to call any witness and for that witness to be able to accurately recall events.

Here, Terry was represented by counsel, and family friends and a private investigator helped gather information to aid in the preparation of his defense. Although Terry's defense may have been impaired by his incarceration, Terry was not unable to

gather facts or pursue any legal strategy. *See United States v. Howard*, 218 F.3d 556, 564 (6th Cir. 2000) (finding that, for the defendant to successfully argue prejudice under the fourth *Barker* factor, the defendant must identify "any specific way in which his defense was prejudiced"). Terry has not identified any *specific* way in which his defense has been prejudiced; thus, this factor has little weight.

\* \* \* \* \*

Although Terry's trial commenced more than one year after his arrest, the totality of the *Barker* factors weigh heavily against Terry. Accordingly, there has been no Sixth Amendment violation of Terry's speedy-trial right. *See Barker*, 407 U.S. at 533.

### 2. The United States did not engage in prosecutorial misconduct.

Terry claims that the United States engaged in prosecutorial misconduct. (DE 213-1 at 8–10.) Specifically, Terry contends that the United States did not disclose "corrupt character evidence" concerning some witnesses and that the United States "bribe[d] and intimidate[d]" witnesses. (DE 213-1 at 9–10.)

### a) Alleged Failure to Disclose Evidence

The Court interprets Terry's first argument to assert that the United States failed to disclose *Brady* and *Giglio* material. To establish a violation of *Brady*, a defendant has the burden of showing that "the Government suppressed evidence, that such evidence was favorable to the defense, and that the suppressed evidence was material." *United States v. Graham*, 484 F.3d 413, 417 (6th Cir. 2007). "Evidence is material for the purposes of a *Brady* claim when there is a reasonable probability that, had the evidence been disclosed to the defense, the outcome of the trial would have been different, where reasonable probability means a probability sufficient to undermine confidence in the outcome." *United States v. Ocampo*, 402 F. App'x 90, 104–05 (6th Cir. 2010) (internal quotations omitted).

29

A violation of *Giglio* occurs when the government fails to disclose evidence affecting the credibility of a witness whose "reliability . . . may well be determinative of guilt or innocence." *Giglio v. United States*, 405 U.S. 150, 153–54 (1972). "Impeachment evidence [against the Government's witnesses] as well as exculpatory evidence falls within the *Brady* rule." *United States v. Bagley*, 473 U.S. 667, 676 (1985). But impeachment evidence is "material" only if the Government's case depended on a witness's testimony. *Giglio*, 405 U.S. at 154–55.

At the outset, it is not clear that Terry satisfies the first requirement of a *Brady* claim, the suppression of evidence. Terry asserts that certain witnesses gave inconsistent statements to Task Force officers; however, the United States submits—and Terry does not contest—that "the defense was provided with all materials in the Government's possession as it relates to the testifying witnesses." (DE 218 at 3.) Terry has also failed to establish that the allegedly suppressed evidence was material. The evidence Terry claims that was suppressed was evidence that could have tested the credibility of three witnesses for the United States. The evidence does not directly address Terry's culpability and ignores the mountain of documentary and other testimonial evidence.

Accordingly, even if the United States did not disclose evidence that may have undermined the credibility of a few witnesses, the Court finds that the evidence would not have undermined confidence in the verdict and a new trial is not warranted on this ground. *See Ocampo*, 402 F. App'x at 104–05.

      b)  <u>Alleged Bribery and Intimidation</u>

The Court interprets Terry's argument that the United States "bribe[d] and intimidate[d]" witnesses to address concerns of nondisclosure of promises made to witnesses and appointing counsel to represent potential defense witnesses. Nondisclosure of

promises made to witnesses is governed by *Giglio*, *United States v. Turner*, 490 F. Supp. 583, 599 (E.D. Mich. 1979), and, for the reasons listed above, the United States did not violate the protections afforded by *Giglio*.

Terry also asserts that the United States harassed Susie and Randall Grubb because the Court appointed attorneys to represent the Grubbs and to counsel the Grubbs concerning their rights. After consulting with their respective attorneys, both Susie and Randall Grubb decided that—if the defense called them to testify—they would assert their rights under the Fifth Amendment. Appointing counsel to represent the interests of a potential witness does not constitute harassment or government intimidation. *See United States v. Emuegbunam*, 268 F.3d 377, 400 (6th Cir. 2001) (collecting cases). In fact, ensuring that a potential witness is fully informed by their own counsel protects against harassment or intimidation, *see id.*; therefore, the Court finds the appointment of counsel for Susie and Randall Grubb not to be in error and not to warrant a new trial.

### 3. The indictment was sufficient.

Terry asserts that the indictment was unconstitutionally vague and overbroad. (DE 213-1 at 10.) In particular, Terry contends that the indictment is overbroad because it is "arbitrarily open-ended" about the dates of the conspiracy and vague because it does not contain any facts that connect him to the death of Patty Smallwood. (DE 213-1 at 10.)

"'[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defendant, and, second, enables him to plead an acquittal or conviction bar in future prosecutions for the same offense.'" *United States v. Anderson*, 605 F.3d 404, 411 (6th Cir. 2010) (alteration in original) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)). "It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long

as those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offense intended to be punished." *United States v. Coss*, 677 F.3d 278, 288 (6th Cir. 2012) (internal quotations omitted).

First, the indictment contained the elements of conspiracy to distribute oxycodone and distribution of oxycodone resulting in the death of another. Terry was charged under 21 U.S.C. § 841(a)(1), which provides that "it shall be unlawful for any person knowingly or intentionally to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." And the penalty provision states that "if death or serious bodily injury results from the use of such substance[, the term of imprisonment] shall be not less than 20 years or more than life." 21 U.S.C. § 841(b). Terry's indictment tracked the statutory language and contained the elements of the offense and elements of the enhanced penalty. Specifically, it charged that (1) Terry knowingly and intentionally distributed pills containing oxycodone, (2) that oxycodone is a Schedule II controlled substance, and (3) that Patty Smallwood's death resulted from her use of oxycodone knowingly and intentionally distributed by Terry. (DE 163); *see Anderson*, 605 F.3d at 411 (finding an indictment that tracked the statutory language to be sufficient). Given these specific allegations, Terry was fairly informed of the charge against him and there was no uncertainty or ambiguity about the necessary elements.

Second, the indictment enables Terry to plead an acquittal or conviction bar for the same offense. The indictment also included the relevant time period for the conspiracy generally and for the distribution of oxycodone resulting in the death of Patty Smallwood. The indictment charged that the conspiracy began "[o]n or about a day in March 2011, the exact date unknown, and continuing through on or about August 22, 2013," and that Terry

distributed oxycodone that resulted in Patty's death "[o]n or about September 9, 2011." (DE 163 at 1.) Terry would accordingly be able to adequately plead an acquittal or conviction bar in any future prosecution arising from the same offenses. *See Anderson*, 605 F.3d at 409, 411 (finding an indictment charging conduct "in or about March 2002 until in or about January 2003" to be sufficient); *see also United States v. Vassar*, 346 F. App'x 17, 19–20 (same for "on or before January 1, 2004, until on or about August 24, 2005"). Thus, the indictment satisfies both *Hamling* prongs and is not unconstitutionally vague or overbroad.

### 4. 18 U.S.C. § 922(g)(1) is not unconstitutional.

Terry claims that 18 U.S.C. § 922(g)(1), the statutory prohibition against felons possessing firearms, is "an arbitrary exercise of tyrannical power" that is unconstitutionally vague and overbroad on its face. (DE 213-1 at 13.) Specifically, Terry asserts that § 922(g) violates the Fifth Amendment Due Process Clause. (DE 213-1 at 13.) Terry does not specify whether the felon-in-possession statute violates his substantive or procedural due process rights, but the Court finds that § 922(g)(1) does not violate any Fifth Amendment rights.

"The ordinary mechanism that [courts] use for . . . determining the procedures that are necessary to ensure that a citizen is not 'deprived of life, liberty, or property, without due process of law,' U.S. Const., Amdt. 5, is the test . . . articulated in *Mathews v. Eldridge*, 424 U.S. 319 (1976)." *Hamdi v. Rumsfeld*, 542 U.S. 507, 528–29 (2004). *Mathews* demands that courts balance the following factors: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." 424 U.S. at 335.

Terry claims that an individual's potential status as a felon is not protected by procedural safeguards. Terry does not, however, offer additional safeguards that could protect non-felons from being adjudicated as a felon and thereby prohibited from possessing a firearm. Further, there are substantial safeguards in place to ensure that non-felons are not convicted under § 922(g)(1). Most importantly, an individual's status as a felon is an *element* of the crime that the government must prove beyond a reasonable doubt. Therefore, all individuals have the procedural protections available in the adversarial trial system.

Overall, the private interest is significant, but the risk of an erroneous deprivation under the current procedural safeguards is low, it is not probable that additional or substitute safeguards could reduce the risk of error, and the Government's interest in preventing convicted felons from possessing firearms is significant. After balancing the *Mathews* factors, it is clear that § 922(g)(1) does not violate an individual's procedural due process rights. *See* 424 U.S. at 335.

The substantive due process analysis begins with a careful description of the asserted right. *Reno v. Flores*, 507 U.S. 292, 302 (1993). If the asserted right is "fundamental," then the government cannot infringe on that right "*at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Id.* (emphasis in original). If the asserted right is not fundamental then the law will be upheld unless there is not a rational basis for the legislature's decision. *See Williamson v. Lee Optical of Okla. Inc.*, 348 U.S. 483, 487–89 (1955).

The right at issue is a convicted felon's right to possess firearms. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that "[l]ike most rights, the right secured by the Second Amendment is not unlimited" and upheld the "longstanding prohibition[ ] on the possession of firearms by felons." 554 U.S. at 626. Plainly, a felon does

34

not have a fundamental right to possess firearms, and *Heller* explicitly notes that the prohibition on the possession of firearms by felons is rational. Therefore, § 922(g)(1) does not violate substantive due process.

Because § 922(g)(1) does not violate procedural or substantive due process rights, the statute does not violate any rights under the Fifth Amendment Due Process Clause.

### 5. Terry's ineffective assistance of counsel claim is premature.

Terry makes a number of assertions that his trial counsel allegedly rendered ineffective assistance. Specifically, Terry questioned his counsel's decision not file a motion to suppress that Terry had drafted, his counsel's decision not to call certain witnesses, the trial strategy, and his counsel's overall demeanor.

In order to succeed on an ineffectiveness claim, Terry must demonstrate that his counsel was deficient and that the deficiency prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). It is generally inappropriate to reach ineffective-assistance-of-counsel claims on direct appeal unless the record is sufficiently developed to review these claims. *United States v. Jones*, 489 F.3d 243, 255 (6th Cir. 2007); *see also Massaro v. United States*, 538 U.S. 500, 504 (2003) ("In light of the way our system has developed, in most cases a motion brought under [28 U.S.C.] § 2255 is preferable to direct appeal for deciding claims of ineffective assistance."). Here, the record is not sufficiently developed to review Terry's ineffective-assistance-of-counsel claim. To evaluate this claim, we would need evidence such as an affidavit from Terry's trial counsel stating why he chose not to file Terry's drafted motion, stating why he called certain witnesses, explaining his trial strategy, and explaining his demeanor. Because insufficient evidence exists to determine whether these actions constituted ineffectiveness, it is inappropriate to reach this claim. *See United States v. Allen*, 254 F. App'x 475, 478 (6th Cir. 2007).

35

### *6. There were no generalized "plain errors."*

Terry reiterates that appointing counsel for Susie and Randall Grubb and for the government's failure to share and introduce *Giglio* evidence constituted plain error. (DE 213-1 at 14–15.) For reasons stated above, these are not errors and do not constitute grounds for a new trial. *See supra* Part II.C.2.

### III.

Terry also filed an unsigned *pro se* "motion to dismiss and/or suppress." (DE 214). It is not clear whether Terry intended to include the document as an exhibit to his *pro se* motion for new trial (*see* DE 213-1 at 3) or to assert the document as an independent motion. Recognizing that Terry filed the Rule 33 motion *pro se* and to avoid any possible prejudice to him, the Court will interpret Terry's unsigned *pro se* motion as a timely, substantive motion filed with the Court.

The arguments in Terry's motion to dismiss and/or suppress, however, mimic the claims in his motion for new trial. Both motions assert the following errors: (1) the government could not rely solely on circumstantial evidence (*compare* DE 213-1 at 11, *with* DE 214-2 at 4); (2) the government's witnesses were unreliable drug addicts that provided testimony that was inconsistent with Terry's witnesses (*compare* DE 213-1 at 9, 12, *with* DE 214-2 at 4–5, 8–9, 12–14); (3) the government contaminated witnesses and did not disclose promises (*compare* DE 213-1 at 8–10, *with* DE 214-2 at 6–7, 10–11); (4) the indictment was invalid (*compare* DE 213-1 at 10, *with* DE 214-2 at 12–14); and (5) the government violated Terry's speedy-trial right (*compare* DE 213-1 at 7–8, *with* DE 214-2 at 15–16). These claims fail for the reasons stated above. *See supra* Parts II.A.1, II.A.3, II.C.1, II.C.2, II.C.3.

36

## IV.

Overall, Terry has not demonstrated that the jury's verdict is against the weight of the evidence, that the jury's verdict is based upon insufficient evidence, or that substantial legal errors trigger the grant of a new trial under the "interest of justice" standard.

Accordingly, the Court **ORDERS** the following:

1. The motion for directed verdict (DE 211) is **DENIED**;

2. The *pro se* motion for new trial (DE 213) is **DENIED**; and

3. The *pro se* motion to dismiss and/or suppress (DE 214) is **DENIED**.

Dated July 21, 2015.

KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY